MICHAEL D. WALSH
YUAN LI
Demidchik Law Firm
17800 Castleton St., Ste. 605
City of Industry, CA 91748
Phone: (626) 317-0033
Email: howard@dcklawfirm.com

Attorneys for Defendant
ZHAO WANG

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        V.<br><br>ZHAO WANG,<br><br>        Defendant. | Case No.: 3:24-CR-1317-RSH<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Sentencing Date: May 8, 2026**<br>**The Honorable Robert S. Huie** |

## I. INTRODUCTION

Zhao Wang is a 42-year-old first-time offender. He was born in Inner Mongolia, China, the son of a police officer and a government worker. He earned a Master's Degree in International Hotel Management. He came to the United States in 2017 as a lawful permanent resident, worked as a waiter and food delivery driver, married in 2022, and became a father in 2023. His sister describes how, when their father was critically ill with kidney disease, Zhao Wang, then not yet twenty years old, offered to donate his own kidney. His father ultimately declined, but the gesture reflects the depth of his commitment to family. His 103-year-old maternal grandmother writes of a grandson who rode his bicycle through the winter cold to bring her food and got up in the middle of the night to bring her water when she coughed. His uncle recounts how Zhao Wang helped him navigate hospitalization during the 2003 SARS epidemic. These are the acts of a person whose fundamental character is one of care and responsibility toward others.

None of this excuses what Mr. Wang did. He participated in a fraud conspiracy that caused devastating harm to over 2,000 elderly victims and approximately $27 million in losses. He accepts full responsibility for his role in this offense. He was the first of five co-defendants to plead guilty, and he has been cooperative throughout the presentence process.

This memorandum addresses the sentencing factors under 18 U.S.C. § 3553(a), responds to the government's characterization of Mr. Wang's role in the offense, and provides the Court with information regarding Mr. Wang's personal history, characteristics, and family circumstances. The defense's previously filed objections to the PSR (Dkt. 115) are incorporated by reference.

*The defense will file a supplemental sentencing memorandum under seal separately, addressing additional matters relevant to sentencing that are not appropriate for the public record, consistent with other sealed filings in this matter. The defense reserves its specific sentencing recommendation for that sealed submission.*

## II. PROCEDURAL HISTORY AND GUIDELINES CALCULATION

On June 21, 2024, a two-count indictment was filed charging Mr. Wang and four co-defendants. On January 15, 2026, Mr. Wang pled guilty to both counts: Count One, Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. §§ 1349, 2326), and Count Two, Conspiracy to Launder Monetary Instruments (18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(I), 1956(h)). He was the first co-defendant to enter a guilty plea. He has been in continuous federal custody since his arrest on August 1, 2024, over 630 days as of the sentencing date.

The PSR calculated a total offense level of 43 (capped from 45) with Criminal History Category I, yielding an advisory guideline range of 720 months (capped by the statutory maximums). PSR ¶ 65. The defense filed objections to the PSR on two principal grounds: (1) the two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1 should not apply because both acts occurred contemporaneously with arrest and caused no material hindrance to the investigation; and (2) Mr. Wang is entitled to the full three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. The government's Sentencing Summary Chart (Dkt. 124) confirms that **the government agrees: it applies zero levels for obstruction and grants the full three-level acceptance reduction.**

The principal remaining dispute concerns the aggravated role adjustment under U.S.S.G. § 3B1.1. The PSR recommended a two-level enhancement. PSR ¶ 60. The government seeks a four-level enhancement, arguing that Mr. Wang was an "organizer or leader" of criminal activity involving five or more participants. Dkt. 125 at 6–8. The defense agrees with the PSR's two-level recommendation and sets forth its position in Section III.C below.

Based on the plea agreement, the parties jointly recommended the following specific offense characteristics and adjustments, with the exception of the aggravated role level, which the plea agreement left open for argument:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(1)): | 7 |
| Loss Amount > $25M (U.S.S.G. § 2B1.1(b)(1)(L)): | +22 |
| Substantial Hardship (U.S.S.G. § 2B1.1(b)(2)): | +2 |
| Relocated/Outside U.S./Sophisticated Means (§ 2B1.1(b)(10)): | +2 |
| False IDs/Authentication Feature (§ 2B1.1(b)(11)): | +2 |
| Money Laundering (§ 2S1.1(b)(2)(B)): | +2 |
| Vulnerable Victims, Large Number (§ 3A1.1(b)(2)): | +4 |
| Aggravated Role (§ 3B1.1) (PSR: +2; Gov't: +4; Def: +2): | Disputed |
| Acceptance of Responsibility (§ 3E1.1): | -3 |
| Full Appellate Waiver Variance (18 U.S.C. § 3553(a)): | -2 |
| History/Characteristics Variance (18 U.S.C. § 3553(a)): | -2 |
| | |
| Criminal History Category: | I |

## III. ARGUMENT FOR A SENTENCE SUBSTANTIALLY BELOW THE ADVISORY GUIDELINE RANGE

Under 18 U.S.C. § 3553(a), the Court must impose a sentence "sufficient, but not greater than necessary" to comply with the statutory purposes of sentencing. The Probation Office itself found that the resulting guideline range "appears excessive for this type of crime and deterrence can be achieved with a reasonable recommendation below the guideline range." PSR ¶ 124. The government similarly recommended significant downward variances totaling four levels. These positions reflect a shared recognition that the guidelines, as mechanically applied, overstate the appropriate sentence in this case. The following factors further demonstrate that a sentence substantially below the advisory guideline range is warranted.

**A. *The History and Characteristics of the Defendant Warrant Leniency***

Zhao Wang was born on February 15, 1984, in Inner Mongolia, China. He was raised by both parents in a stable household. His father, Zhiwei Wang, was a police officer; his mother, Zhao Linli, was a government worker. PSR ¶ 77. His formative years were, by his account and his family's, devoid of abuse or instability. PSR ¶ 79. He was described consistently by those who know him as quiet, diligent, and deeply devoted to family.

Mr. Wang's upbringing in Inner Mongolia was modest. As his mother writes in her letter to the Court, winters were bitterly cold and conditions were harsh. As a child, he woke early to clear snow from the family's yard and scattered food for birds in the cold, worried they would go hungry. His 103-year-old grandmother, Li Jimei, who watched him grow up, describes him as a child who rode his bicycle through freezing weather to bring her supplies, who got up at night to bring her water when she coughed, and who once prepared breakfast for her on his own. These are the small acts of a person whose instinct is to care for others.

Mr. Wang's family suffered significant hardship. His grandfather died of esophageal cancer. His father developed severe kidney disease and spent over a decade bedridden before passing away in 2013. PSR ¶ 77. When his father's condition was at its most critical, Mr. Wang, then not yet twenty years old, offered to donate a kidney to save his father's life. Although his father ultimately declined, the willingness to make that sacrifice speaks to the depth of his commitment to family. After his father's death, as the eldest son, Mr. Wang assumed responsibility for supporting his mother, who has since undergone thyroid and lung surgeries.

Mr. Wang's sister, Wang Xiao, provides a particularly telling account of his character. At her wedding, when she was visibly pregnant and embarrassed by remarks from guests, it was Zhao Wang who stood up publicly and said: "If you have opinions, you can say them outside. My sister is carrying a child, and I think she is beautiful." When Wang Xiao later needed to entrust her infant son to others' care due to work obligations, it was Zhao Wang who raised the child from eight months old through elementary school age. To this day, her son regards Zhao Wang as a father figure.

Mr. Wang's uncle, Zhao Zhendong, recounts a particularly memorable episode. During the 2003 SARS outbreak, when the overall environment was tense and medical resources were limited, it was Zhao Wang who proactively helped his uncle contact the hospital, handle admission procedures, and communicate with doctors about the treatment plan. Years later, when his uncle needed to travel from Inner Mongolia to Beijing for medical care, Mr. Wang arranged all the appointments and navigated the hospital's complex digital systems on his behalf.

Mr. Wang earned a Master's Degree in International Hotel Management in China in 2011. PSR ¶ 87. He entered the United States in December 2017 as a lawful permanent resident. PSR ¶ 76. While in the United States, he worked as a waiter and as a food delivery driver. PSR ¶ 89. He married Xiaoyu Wang in December 2022, and their son Jalen was born in May 2023. PSR ¶ 80.

His former colleague, Zhang Jianfeng, describes Mr. Wang at work as meticulous, patient, and willing to invest time in getting details right. He recalls how Mr. Wang would volunteer for business travel assignments so that his colleagues with young children could stay home. His friend Chen Chen, who met Mr. Wang in 2018 at a Chinese restaurant in Irvine, California, describes him as patient, warm, conscientious, and responsible.

Eight character reference letters are submitted with this memorandum as Exhibit A. They are from Mr. Wang's wife, mother, 103-year-old maternal grandmother, older sister, father-in-law, maternal uncle, a former colleague, and a friend. They paint a consistent portrait of a person who is family-oriented, responsible, hardworking, and caring. They are offered not to excuse Mr. Wang's conduct, but to provide the Court with a complete picture of the person it is sentencing.

### B. *Mr. Wang Is a First-Time Offender with Zero Criminal History*

Mr. Wang has no prior criminal convictions of any kind: no juvenile adjudications, no adult convictions, no pending charges, and no other known criminal conduct. PSR ¶¶ 67–74. He is 42 years old and, until this offense, had lived a law-abiding life. A criminal history inquiry through the FBI, California DMV, and other databases revealed nothing. PSR ¶ 66. This is his first encounter with the criminal justice system. The experience of spending over twenty months in federal custody has had a profound and sobering impact on him.

### C. *Mr. Wang's Role Must Be Viewed in the Context of the Full Conspiracy*

The government's sentencing memorandum characterizes Mr. Wang as "the leader of a transnational criminal organization." Dkt. 125 at 2. The government seeks a four-level aggravated role enhancement under U.S.S.G. § 3B1.1(a), contending that Mr. Wang was an "organizer or leader" of criminal activity involving five or more participants. Id. at 6–8. The PSR, by contrast, recommended only a two-level enhancement. PSR ¶ 60. The defense agrees with the PSR's assessment and respectfully submits that the government's characterization is a dramatic overstatement of Mr. Wang's actual role.

**1. The overall conspiracy was designed, directed, and controlled by India-based syndicates.**

The government's own description of the conspiracy's structure reveals that it operated on two distinct levels: a foreign operation and a domestic operation. The foreign operation consisted of India-based call centers that designed and operated the scams, directly contacted victims through pop-up ads, emails, and phone calls, employed social engineering techniques, gained remote access to victims' computers, and directed victims to send money. Below the call centers were India-based brokers who served as intermediaries. Only after the call centers had successfully defrauded a victim and the brokers had relayed the information did the domestic operation come into play. Dkt. 125 at 4. The India-based principals were the architects and ultimate beneficiaries

of this scheme. They received over 80% of the victims' losses. They remain uncharged and beyond the reach of this Court.

**2. Mr. Wang's domestic group operated as an independent contractor, not as part of any syndicate.**

Mr. Wang's small domestic group was one of what are believed to be dozens, if not hundreds, of similar small operations across the United States that performed the same function: receiving instructions from India-based brokers, providing fictitious names and addresses, and retrieving cash-laden packages from retail locations. Mr. Wang's group was not affiliated with any particular Indian syndicate. They had no access to the syndicates' core operations, no involvement in designing the scams, no role in operating the call centers, and no contact with victims. The relationship between Mr. Wang's group and the India-based organizations was that of an independent contractor performing a discrete logistical task, not that of a leader directing a transnational enterprise.

The government's own evidence confirms this characterization. Co-defendant Xin Wang's August 2023 text message, prominently quoted in the government's memorandum, states: "What I do is picking up packages from CVS with a fake ID. [The packages] contain cash. Laundering money for Indian scam syndicate(s). Large syndicate(s). My boss(es) launder over one million US dollars in a week." Dkt. 125 at 2. This language is revealing. It describes the domestic operation as laundering money for the Indian syndicates, not running them. The syndicates are identified as separate, external entities. The word "large" refers to the syndicates, not to the domestic group.

**3. Mr. Wang's group did not know the nature of the fraud against elderly victims.**

Because Mr. Wang and his associates never contacted victims directly, they did not have knowledge of the specific nature of the fraud being perpetrated. They did not know that the victims were elderly. They did not know the details of the social engineering techniques being used. They did not know that victims were being impersonated by fake government agents, bank employees, or tech support representatives. Mr. Wang and his group knew that the money they were handling was from something illegal, and they did not care enough to inquire further. **That indifference makes them culpable, and Mr. Wang accepts that responsibility.** But it is a fundamentally different level of culpability from the individuals who deliberately and systematically targeted vulnerable elderly Americans, built trust with them through elaborate deceptions, and stripped them of their life savings.

**4. Mr. Wang's domestic group was small and loosely structured.**

The government characterizes Mr. Wang as managing "all of his co-defendants charged in the indictment." Dkt. 125 at 7. This overstates the reality. Not every co-defendant worked for Mr. Wang. The structure was loose and informal, more resembling a group of acquaintances who took on work together than a hierarchical criminal organization. Mr. Wang began as a runner himself,

personally retrieving packages from retail locations. Because the volume of work exceeded what one person could handle, he asked friends and acquaintances to help. They agreed and were paid for their work. This is how the domestic group formed.

Coordinators like Mr. Wang worked with different Indian syndicates on a job-by-job basis, much like independent contractors. The runners who retrieved packages likewise worked with coordinators on an ad hoc basis, not as permanent employees or subordinates in a fixed hierarchy. Mr. Wang benefited from coordinating the work, and he takes responsibility for that. But his role is best understood as an upgraded version of a runner who took on logistical coordination because of volume, not as the boss of a traditional criminal organization.

**5. A two-level enhancement accurately reflects Mr. Wang's role.**

The § 3B1.1 commentary instructs courts to consider "the degree of participation in planning or organizing the offense," "the nature and scope of the illegal activity," and "the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (n.4). Viewed against the full scope of this transnational conspiracy, Mr. Wang did not plan or design the fraud scheme. He did not operate the call centers. He did not contact victims. He did not create the phishing emails, pop-up advertisements, or social engineering scripts. He managed a small, loosely organized domestic pickup operation that functioned as one of many independent contractor groups servicing India-based syndicates. The PSR's two-level enhancement accurately reflects this role. A four-level enhancement, reserved for organizers and leaders of the overall criminal activity, would attribute to Mr. Wang a degree of authority and control he simply did not possess.

**D. *The Impact on Mr. Wang's Child and Family***

Mr. Wang's two-year-old son, Jalen, has been separated from his father for virtually the entirety of his conscious memory. Mr. Wang has been in custody since August 1, 2024; Jalen was barely one year old at the time. As his wife, Xiaoyu Wang, writes in her letter to the Court, the child repeatedly asks where his father is and says he wants to wait for his father to come home. His emotions at night have become increasingly unstable, and his attachment to his father is more pronounced than she had anticipated. For now, video calls provide an important but limited source of comfort.

Before meeting Zhao Wang, Mrs. Wang had gone through a very difficult first marriage and suffered from chronic anxiety and insomnia. It was in her relationship with Mr. Wang that she first experienced a stable, safe, and respectful family life. She transferred a business she had built over many years in China and came to the United States to start a new life with him. His absence has upended the stability she had only recently found.

Mr. Wang's mother, Zhao Linli, is 70 years old and in declining health, having undergone thyroid and lung surgeries. PSR ¶ 77. His maternal grandmother, Li Jimei, is 103 years old. She writes that she prays daily for his return. Mr. Wang's father-in-law, Wang Guobao, describes Mr.

Wang as the person who helped his family adjust to life in America, taking them to Chinese supermarkets, gradually introducing them to the local environment, and even renting an RV to give them the experience of campground life after his father-in-law made a casual remark about it at dinner.

While collateral consequences to family are not ordinarily a basis for departure, they are a permissible consideration under § 3553(a). The length of Mr. Wang's sentence will determine whether Jalen grows up with any meaningful relationship with his father. Every additional month of incarceration deepens the harm to a child who has already endured the loss of his father's presence during the most formative period of his life.

### E. *The Virtual Certainty of Deportation Is an Extraordinary Collateral Consequence*

Mr. Wang is a citizen of China who entered the United States as a lawful permanent resident. PSR ¶ 76. The plea agreement expressly acknowledges that his conviction "makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States." PSR at 10. He may also be denied future citizenship and admission.

For Mr. Wang, deportation means permanent banishment from the United States, the loss of the lawful life he built here, separation from the community and business he and his wife established, and the enduring stigma of a federal conviction. Deportation is not merely an administrative consequence; it is a severe, life-altering punishment that compounds the sentence of imprisonment.

Moreover, deportation effectively addresses the goal of public protection under § 3553(a)(2)(C). Once removed, Mr. Wang will be unable to engage in similar conduct within the United States. This reality weighs against the need for an extended period of incarceration for incapacitation purposes.

### F. *The Need to Avoid Unwarranted Sentencing Disparities*

Under 18 U.S.C. § 3553(a)(6), the Court must consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. The advisory guideline range in this case is driven almost entirely by the loss amount. The 22-level enhancement under U.S.S.G. § 2B1.1(b)(1)(L) for losses exceeding $25 million accounts for the majority of the offense level calculation. The Sentencing Commission's loss table has been widely criticized for producing sentences that are disproportionate to individual culpability, particularly in cases involving large aggregate losses spread across many victims.

Both the Probation Office and the government recognized this concern. The Probation Office found the guideline range "excessive" and recommended 240 months, roughly one-third of the guideline range. PSR ¶¶ 124, 130. The government recommended four levels of downward

variances, arriving at 235 months. These positions implicitly acknowledge that the guidelines overstate the appropriate sentence.

Sentencing Mr. Wang to a term approaching the guideline range would also create an unwarranted disparity between Mr. Wang and the India-based principals who conceived, designed, and directed the fraud scheme but who remain uncharged and beyond the reach of United States law enforcement. Those individuals received over 80% of the victims' losses. Mr. Wang, whose small domestic group operated as one of many independent contractors servicing those syndicates, should not bear the punishment that properly belongs to the architects of this scheme.

### G. *The Guideline Range Is Greater Than Necessary*

The parsimony principle requires the Court to impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Even the Probation Office's recommendation of 240 months reflects a recognition that the 720-month guideline range vastly overstates what is needed to achieve the purposes of sentencing.

**Just punishment.** Mr. Wang's conduct warrants a significant term of imprisonment, and the defense does not contend otherwise. However, the statutory purposes of sentencing do not require a sentence approaching the advisory guideline range. The seriousness of the offense is already reflected in the guidelines through the 22-level loss enhancement, the vulnerable victim adjustment, the money laundering enhancement, and the other specific offense characteristics. The Court need not pile additional severity on top of what the guidelines have already accounted for.

**Deterrence.** General deterrence in fraud cases does not increase meaningfully beyond a certain threshold. Research consistently demonstrates that the certainty of punishment, rather than its severity, is the primary driver of deterrence. A sentence well below the guideline range will send a clear message that participation in elder fraud schemes carries severe consequences.

**Protection of the public.** Mr. Wang is a first-time offender with no history of violence or any prior criminal conduct. He will face virtually certain deportation upon completion of his sentence, which will effectively remove him from the environment in which this offense occurred.

**Rehabilitation.** Mr. Wang has a young son who is now two years old. A sentence that allows Mr. Wang to eventually reunite with his child and fulfill his parental responsibilities serves the rehabilitative goals of sentencing. Mr. Wang is encouraged to avail himself of vocational and cognitive behavioral programs offered by the Bureau of Prisons, and his family has committed to providing supervision and support upon his release.

### IV. NOTICE OF SUPPLEMENTAL FILING

The defense respectfully informs the Court that a supplemental sentencing memorandum will be filed under seal separately, addressing additional matters relevant to sentencing that are not

appropriate for the public record, consistent with other sealed filings in this matter. The defense reserves its specific sentencing recommendation for that sealed submission.

## V. CONCLUSION

Zhao Wang is a 42-year-old first-time offender who has accepted full responsibility for his conduct. He pled guilty at the earliest opportunity, the first among five co-defendants to do so. He has been in federal custody for over twenty months. He has a two-year-old son who asks every day where his father is. He has a 70-year-old mother who has undergone cancer surgery. He has a 103-year-old grandmother who prays for him daily. He faces certain deportation.

The guidelines already account for the seriousness of the offense through the 22-level loss enhancement, the vulnerable victim adjustment, and the other specific offense characteristics. Both the Probation Office and the government have recognized that the resulting guideline range is excessive. For all of the foregoing reasons, and for the additional reasons to be set forth in the defense's sealed supplemental memorandum, Mr. Wang respectfully requests that the Court impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Date: May 1, 2026                         DEMIDCHIK LAW FIRM, P.C.

By: _/s/ Yuan Li_____
        Yuan Li, Esq.
        Attorneys for Defendant ZHAO WANG